UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

FEB 21 2019

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. |
| | § | |
| RAFAEL E. PINTO-FRANCESCHI | § | 19 CR 135 |
| and | § | UNDER SEAL |
| FRANZ H. MULLER-HUBER | § | |
| | § | |

**INDICTMENT**

THE GRAND JURY CHARGES:

**COUNT ONE**
**(Conspiracy – 18 U.S.C. § 371)**

**Introduction**

At all relevant times, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Sections 78dd-1, *et seq.*, was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining

1

business for, or directing business to, any person.

2.      Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company.   PDVSA and its subsidiaries were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government.  PDVSA Services, Inc. ("PSI") was the U.S.-based affiliate of PDVSA located in Houston, Texas, that, at various times, was responsible for international purchasing on behalf of PDVSA.   Bariven S.A. was the PDVSA procurement subsidiary responsible for equipment purchases.   PDVSA and its wholly owned subsidiaries, including PSI and Bariven S.A. (hereinafter collectively referred to as "PDVSA") were "instrumentalities" of the Venezuelan government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).  PDVSA officers and employees were "foreign officials" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A).

3.      PDVSA awarded contracts for energy services and equipment in a number of ways, including through a competitive bidding process.   In some instances, PDVSA also awarded sole source contracts.

4.      "Company A," a company whose identity is known to the Grand Jury, was a U.S.-based supplier of industrial equipment that was incorporated in the United States.  Company A was thus a "domestic concern" as that term is used in

the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Company A and its affiliates were PDVSA's exclusive supplier of heavy equipment manufactured by another company headquartered in the United States.

5.     "Company A's Affiliate," a company whose identity is known to the Grand Jury, was a Curacao-based company affiliated with Company A.

### The Defendants and Their Co-Conspirators

6.     Defendant **RAFAEL ENRIQUE PINTO FRANCESCHI** ("**PINTO**") was a Venezuelan national and resident of the United States. **PINTO** was employed as a sales representative for Company A. **PINTO** was thus a "domestic concern" and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7.     Defendant **FRANZ HERMAN MULLER HUBER** ("**MULLER**") was a Venezuelan national and resident of the United States. **MULLER** was the President of Company A. **MULLER** was thus a "domestic concern" and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8.    Jose Orlando Camacho ("Camacho"), who has been charged separately, was a dual Venezuelan and United States citizen who resided in the Southern District of Texas.  Between approximately 2004 and 2013, Camacho was employed by PDVSA.  During that time, Camacho held a number of positions related to procurement, including serving as a sourcing supervisor and planning and procurement manager for PSI.

9.    Ivan Alexis Guedez ("Guedez"), who has been charged separately, was a United States citizen who resided in the Southern District of Texas.  Between approximately 2006 and 2011, Guedez was employed by PSI.  During that time, Guedez held a number of positions related to procurement, including serving as the purchasing manager for PSI.

10.    "Official A," an individual whose identity is known to the Grand Jury, was a Venezuelan national and resident of the United States.  Until approximately 2009 or 2010, Official A was employed by PSI as a buyer.

11.    During their employment at PDVSA, Camacho, Guedez, and Official A (together the "PDVSA officials") were each a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

**Other Entities**

12.    "Shell Company A," whose identity is known to the Grand Jury, was a company organized under the laws of Panama.

4

13. The "Swiss Account" was a bank account in Switzerland in the name of Shell Company A.

14. The "Panama Account" was a bank account in Panama held in the name of one of **PINTO**'s associates.

15. The "Puerto Rico Account" was a bank account in Puerto Rico in the name of a corporate entity whose identity is known to the Grand Jury.

### **The Conspiracy**

16. Beginning in or around 2009 and continuing through at least 2013, in the Southern District of Texas, and elsewhere, the defendants,

**RAFAEL ENRIQUE PINTO FRANCESCHI and
FRANZ HERMAN MULLER HUBER**

did willfully and knowingly conspire, confederate, and agree with others known and unknown to the Grand Jury to commit offenses against the United States, that is, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful

5

duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist Company A, **PINTO**, and **MULLER** in obtaining and retaining business for and with, and directing business to, Company A and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a).

## **Manner and Means of the Conspiracy**

17.    The manner and means by which **PINTO**, **MULLER**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

18.    **PINTO** and the PDVSA officials agreed that in exchange for bribe payments, which they called "commissions," the PDVSA officials would assist Company A in its business with PDVSA.  **PINTO,** and later **MULLER,** would receive kickbacks as part of the scheme.  They agreed that they would take three percent of each payment that PDVSA made to Company A and split it equally amongst themselves.

19.    **PINTO** and **MULLER**, together with others, paid bribes to the PDVSA officials through the use of interstate and foreign wires in order to secure an improper advantage, influence acts and decisions of the PDVSA officials in their

6

official capacities, and induce the PDVSA officials to do and omit to do certain acts, including, but not limited to:

a.   taking steps to ensure that end users at PDVSA would request a certain brand of equipment for which Company A was a distributor, resulting in additional business from PDVSA for Company A;

b.   providing **PINTO** with inside information regarding PDVSA;

c.   assisting Company A in receiving payment for previously awarded PDVSA business, including by requesting payment priority for Company A over other vendors.

20.   Beginning in or around 2009 and continuing through at least 2013, the conspirators agreed that three percent of every payment made by PDVSA to Company A would be split as bribe payments and kickbacks as follows:

a.   initially, as an even four-way split between bribes to Camacho, Guedez, and Official A, and kickbacks to **PINTO**;

b.   after Official A's employment at PDVSA was terminated in approximately 2009 or 2010, as an even three-way split between Camacho, Guedez, and **PINTO**; and

c.   from in or around March 2012, **MULLER** received 0.5% while Camacho, Guedez, and **PINTO** evenly split the remaining 2.5%.

21.     **MULLER**, together with others, caused bribe payments to be wired from Company A's Affiliate's bank account in Curacao to the Swiss Account.

22.     Guedez maintained a spreadsheet tracking the amounts paid into the Swiss Account from Company A's Affiliate, and the amounts disbursed from the Swiss Account to the foreign officials, **PINTO**, and **MULLER**.

23.     **PINTO** and **MULLER**, together with others, attempted to conceal, and did in fact conceal, the nature, source, and ownership of the bribes and kickbacks, by:

a. Providing Guedez and Camacho with information regarding PDVSA's payments to Company A, which Guedez used to create false invoices in the name of Shell Company A;

b. Causing invoices from Shell Company A to be paid, despite knowing that Shell Company A had not provided any services to Company A or Company A's Affiliate;

c. Communicating about the scheme using their personal email accounts, rather than their official Company A email accounts.

24.     Over the course of the scheme, **PINTO** and **MULLER** caused Company A's Affiliate to wire in excess of $3 million to the Swiss Account.

## Overt Acts

25.     In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

26.     In or about 2009, **PINTO**, Camacho, Guedez, and Official A met at a restaurant on Westheimer Road in Houston, Texas, and discussed and agreed upon the bribery scheme.

27.     On or about July 1, 2009, **PINTO** sent an email to Camacho, requesting that Camacho forward the email on to Official A and discussing purchase orders that were, as translated into English, "under the commission agreement to date . . ."

28.     On or about August 3, 2010, **PINTO** sent an email to Camacho and Guedez, listing purchase orders for which Company A had been paid and noting the three-percent calculation to be paid as part of the scheme.  In the email, **PINTO** distinguished between one invoice, for which "el pelon" (a nickname for Official A) should receive a portion of the commission payment, and two invoices for which "el pelon" was not to receive a portion.

29.     On or about February 16, 2011, **PINTO** sent an email to Camacho and Guedez listing purchase orders for which Company A had been paid and noting the three-percent calculation for this group of invoices as $167,601.99.

9

30.     On or about February 21, 2011, Guedez emailed **MULLER** a false invoice in the amount of $167,601.99 in the name of Shell Company A.  The invoice falsely stated, in Spanish, that Shell Company A had performed consulting services for Company A's Affiliate and directed Company A's Affiliate to send payment to the Swiss Account, notwithstanding that Shell Company A had not performed any services for Company A or Company A's Affiliate.

31.     On or about March 10, 2011, **MULLER** caused $167,601.99 to be wired to the Swiss Account.

32.     On or about April 2, 2012, **PINTO** sent an email to Camacho and Guedez listing purchase orders for which Company A had been paid and noting the three-percent calculation for this group of invoices as $159,542.98.

33.     On or about April 3, 2012, Guedez emailed **MULLER** a false invoice in the amount of $159,542.98 in the name of Shell Company A.  The invoice falsely stated, in Spanish, that Shell Company A had performed consulting services for Company A's Affiliate and directed Company A's Affiliate to send payment to the Swiss Account, notwithstanding that Shell Company A had not performed any services for Company A or Company A's Affiliate.

34.     On or about April 10, 2012, **MULLER** caused $159,542.98 to be sent to the Swiss Account.

10

35.     On or about December 2, 2012, **PINTO** sent an email to Camacho and Guedez listing purchase orders for which Company A had been paid and noting the three-percent calculation for this group of invoices as $62,217.17.

36.     On or about December 26, 2012, Guedez emailed **MULLER** a false invoice in the amount of $62,217.17 in the name of Shell Company A.  The invoice falsely stated, in Spanish, that Shell Company A had performed consulting services for Company A's Affiliate and directed Company A's Affiliate to send payment to the Swiss Account, notwithstanding that Shell Company A had not performed any services for Company A or Company A's Affiliate.

37.     On or about January 16, 2013, **MULLER** caused $62,217.17 to be sent to the Swiss Account.

38.     On or about February 18, 2013, **PINTO** sent an email to Camacho and Guedez listing the payments made by PDVSA to Company A, the payments made by Company A's Affiliate to the Swiss Account, and the payments owed to each individual.

39.     On or about August 20, 2014, **PINTO** forwarded the email described in paragraph 38 to Camacho.

All in violation of Title 18, United States Code, Section 371.

11

## COUNT TWO
### (Conspiracy – 18 U.S.C. § 1349)

40.     Paragraphs 1 through 15 and 17 through 39 are realleged and incorporated by reference as though fully set forth herein.

41.     Beginning in or around 2009 and continuing until at least 2013, in the Southern District of Texas and elsewhere, the defendants,

**RAFAEL ENRIQUE PINTO FRANCESCHI and
FRANZ HERMAN MULLER HUBER**

did knowingly and intentionally conspire to devise a scheme and artifice to defraud Company A and Company A's Affiliate, and to obtain money and property from Company A and Company A's Affiliate by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds in violation of Title 18, United States Code, Section 1343.

### Manner and Means of the Conspiracy

42.     The manner and means by which **PINTO, MULLER,** and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

43.     **PINTO** and **MULLER** would and did receive a share of the money sent to the Swiss Account.

12

44.     Devising a system that concealed from Company A and Company A's Affiliate that **PINTO** and **MULLER** would receive a share of the "commissions" sent to the Swiss Account, specifically:

a. **PINTO** used a personal email account, and not his Company A email account, to provide Guedez with the information regarding PDVSA's payments to Company A, which Guedez used to create false invoices in the name of Shell Company A;

b. Guedez used an email account in the name of Shell Company A to send the false invoices to **MULLER**, through **MULLER**'s personal email account, and not his Company A email account;

c. **MULLER** caused Company A's Affiliate to pay the false invoices sent by Guedez for purported consulting services provided to Company A's Affiliate, despite the fact that Shell Company A did not actually provide any consulting, or other, services;

d. After payment for the false invoices was sent to the Swiss Account, Guedez dispersed the proceeds to the conspirators, including **PINTO** and **MULLER**, through offshore accounts, accounts in the names of third parties, and accounts in the names of corporate entities.

e. **PINTO** provided instructions to Guedez and Camacho regarding the bank accounts to which **PINTO**'s and **MULLER**'s kickbacks were sent.

13

f.  In total, between approximately February 2011 and May 2013, **PINTO** received at least $985,416.60 from the Swiss Account.

g.  In total, between approximately March 2012 and December 2012, at least $263,562.99 was sent from the Swiss Account to the Puerto Rico account for **MULLER**'s benefit.  Between approximately March 2012 and August 2015, at least $258,649.94 was sent from the Puerto Rico account to accounts in **MULLER**'s name.

All in violation of Title 18, United States Code, Section 1349.

14

## COUNTS THREE and FOUR
### (Wire Fraud – 18 U.S.C. §§ 1343 and 2)

45.     Paragraphs 1 through 15, 17 through 39, and 42 through 44 are realleged and incorporated by reference as though fully set forth herein.

46.     On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendants,

### RAFAEL ENRIQUE PINTO FRANCESCHI and
### FRANZ HERMAN MULLER HUBER

aided and abetted by each other, having devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing the aforesaid scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, as follows:

| COUNT | DATE | WIRE COMMUNICATION |
|-------|------|--------------------|
| Three | December 26, 2012 | Email from Guedez to **MULLER** attaching a false invoice in the amount of $62,217.17 in the name of Shell Company A. |
| Four | February 18, 2013 | Email from **PINTO** to Camacho and Guedez listing the payments made by PDVSA to Company A, the payments made by Company A's Affiliate to the Swiss Account, and the payments owed to each individual. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

15

## COUNT FIVE
### (Conspiracy – 18 U.S.C. § 1956(h))

47.     Paragraphs 1 through 15 and 17 through 39, and 42 through 44, are realleged and incorporated by reference as though fully set forth herein.

48.     Beginning in or around 2009 and continuing until at least 2015, in the Southern District of Texas and elsewhere, the defendants,

**RAFAEL ENRIQUE PINTO FRANCESCHI and
FRANZ HERMAN MULLER HUBER,**

did knowingly conspire, confederate, and agree with Camacho, Guedez, Official A, and others known and unknown to the Grand Jury to commit offenses under Title 18, United States Code, Section 1956, namely:

a. knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, to conduct or attempt to conduct such a financial transaction which in fact represented the proceeds of specified unlawful activity, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, namely, (1) bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) wire fraud, Title 18, United States Code, Section 1343, in violation of Title 18, United States Code, Section 1956(a)(1)(B); and

16

b. transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, namely, (1) bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, and (2) wire fraud, Title 18, United States Code, Section 1343, and this in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## Manner and Means of the Conspiracy

49. The manner and means by which **PINTO**, **MULLER**, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

50. **PINTO** and **MULLER** paid and caused Company A and Company A's Affiliate to pay three percent of the funds received by Company A from PDVSA to Shell Company A, knowing that these payments constituted (1) bribes to the PDVSA officials for assistance with getting paid on outstanding invoices on PDVSA contracts, as well as assistance with winning additional PDVSA business, and (2) kickbacks to themselves.

51.    **PINTO** and **MULLER**, together with others, concealed and attempted to conceal, the nature, source, and ownership of the bribes and kickbacks, by creating false invoices for Shell Company A for services that were never performed and causing these false invoices for Shell Company A to be paid.

52.    **PINTO** and Guedez, each tracked the payments made into the Swiss Account by Company A's Affiliate and the amounts owed to the various members of the conspiracy.

53.    **PINTO** and **MULLER**, together with others, concealed and attempted to conceal the fact that the conspirators were the ultimate beneficiaries of these payments through a variety of means, namely:

    a. Payments for Official A's benefit were wired from the Swiss Account to an account in the name of one of Official A's relatives.

    b. The first payment for **PINTO** was wired from the Swiss Account to the Panama account, which was in the name of one of **PINTO**'s associates.

    c. Later payments for **PINTO** were wired from the Swiss Account to an account in the Cayman Islands.

    d. Payments for Camacho were wired from the Swiss Account to an account in the Cayman Islands in the name of one of Camacho's relatives.

e.  Payments for **MULLER** were wired from the Swiss Account to the Puerto

Rico Account, and then wired from the Puerto Rico Account to accounts

at multiple banks in **MULLER**'s name.

All in violation of Title 18, United States Code, Section 1956(h).

## NOTICE OF CRIMINAL FORFEITURE
## (18 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

54. Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants,

**RAFAEL ENRIQUE PINTO FRANCESCHI and
FRANZ HERMAN MULLER HUBER,**

that in the event of conviction of either of the offenses charged in Counts 1 and 2 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

## NOTICE OF FORFEITURE
## (18 U.S.C. § 982(a)(1))

55. Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants,

**RAFAEL ENRIQUE PINTO FRANCESCHI and
FRANZ HERMAN MULLER HUBER,**

that upon conviction of the offense charged in Count 3 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, involved in money laundering or traceable to such property.

## PROPERTY IN SUBSTITUTION

56.     In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States may seek to forfeit any other property of

the defendants in substitution up to the total value of the property subject to forfeiture.  The United States may seek the imposition of a money judgment against each defendant.

A TRUE BILL

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

ROBERT ZINK
ACTING CHIEF
FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BY:

JOHN P. PEARSON
ROBERT S. JOHNSON
ASSISTANT UNITED STATES
ATTORNEYS

BY:

SARAH E. EDWARDS
SONALI D. PATEL
TRIAL ATTORNEYS

21