

United States Courts
Southern District of Texas
FILED
AUG 09 2019
David J. Bradley, Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. 19-cr-135-2** |
| | § | |
| **FRANZ H. MULLER-HUBER** | § | |
| | § | |

## INFORMATION

THE UNITED STATES ALLEGES:

## Introduction

At all relevant times, unless otherwise specified:

1.    Petroleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company.   PDVSA and its subsidiaries were responsible for the exploration, production, refining, transportation, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government.  PDVSA Services, Inc. ("PSI") was the U.S.-based affiliate of PDVSA located in Houston, Texas, that, at various times, was responsible for international purchasing on behalf of PDVSA.  Bariven S.A. ("Bariven") was the PDVSA procurement subsidiary responsible for equipment purchases.  PDVSA awarded contracts for energy services and equipment in a number of ways, including

through a competitive bidding process.  In some instances, PDVSA also awarded sole source contracts.

2.      PDVSA and its wholly owned subsidiaries, including PSI and Bariven S.A. (hereinafter collectively referred to as "PDVSA") were "instrumentalities" of the Venezuelan government as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).  PDVSA officers and employees were "foreign officials" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

3.      "Company A," a company whose identity is known to the United States, was a U.S.-based supplier of industrial equipment that was incorporated in the United States.  Company A was thus a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).  Company A and its affiliates were PDVSA's exclusive supplier of heavy equipment manufactured by another company headquartered in the United States.

4.      At all relevant times, defendant **FRANZ HERMAN MULLER HUBER** ("**MULLER**") was a dual Venezuelan-Swiss citizen and resident of the United States.  **MULLER** was the President of Company A.  **MULLER** was thus a "domestic concern" and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern" as

2

those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5.     Rafael Enrique Pinto Franceschi ("Pinto"), who has been charged separately, was a Venezuelan national and resident of the United States.  Pinto was employed as a sales representative for Company A.  Pinto was thus a "domestic concern" and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern" as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6.     Jose Orlando Camacho ("Camacho"), who has been charged separately, was a dual Venezuelan and United States citizen who resided in the Southern District of Texas.  Between approximately 2004 and 2013, Camacho was employed by PDVSA.  During that time, Camacho held a number of positions related to procurement, including serving as a sourcing supervisor and planning and procurement manager for PSI.

7.     Ivan Alexis Guedez ("Guedez"), who has been charged separately, was a United States citizen who resided in the Southern District of Texas.  Between approximately 2006 and 2011, Guedez was employed by PSI.  During that time, Guedez held a number of positions related to procurement, including serving as the purchasing manager for PSI.

3

8.     "Official A," an individual whose identity is known to the United States, was a Venezuelan national and resident of the United States.   Until approximately 2009 or 2010, Official A was employed by PSI as a buyer.

9.     During their employment at PDVSA, Camacho, Guedez, and Official A (together the "PDVSA officials") were each a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

10.     "Company A's Affiliate," a company whose identity is known to the United States, was a Curacao-based company affiliated with Company A.

### Other Entities

11.     "Shell Company A," whose identity is known to the United States, was a company organized under the laws of Panama.

12.     The "Swiss Account" was a bank account in Switzerland in the name of Shell Company A.

13.     The "Puerto Rico Account" was a bank account in Puerto Rico in the name of a corporate entity whose identity is known to the United States.

### COUNT ONE
### (Conspiracy – 18 U.S.C. § 371)

14.     Paragraphs 1 through 13 are realleged and incorporated by reference as though fully set forth herein.

15.     Beginning in or around 2009 and continuing through at least 2013, in the Southern District of Texas, and elsewhere, the defendant,

4

## FRANZ HERMAN MULLER HUBER

did willfully and knowingly conspire, confederate, and agree with Pinto and others known and unknown to the United States to commit offenses against the United States, that is, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist **MULLER**, Pinto, and Company A, in obtaining and retaining business for and with, and directing business to, Company A and others, in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2(a).

5

## Manner and Means of the Conspiracy

16.     The manner and means by which **MULLER**, Pinto, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

17.     Pinto and the PDVSA officials agreed that in exchange for bribe payments, which they called "commissions," the PDVSA officials would assist Company A in its business with PDVSA. Pinto, and later **MULLER**, would receive kickbacks as part of the scheme. They agreed that they would take three percent of each payment that PDVSA made to Company A and split it equally amongst themselves.

18.     **MULLER** and Pinto, together with others, paid bribes to the PDVSA officials through the use of interstate and foreign wires in order to secure an improper advantage, influence acts and decisions of the PDVSA officials in their official capacities, and induce the PDVSA officials to do and omit to do certain acts, including, but not limited to:

        a.  taking steps to ensure that end users at PDVSA would request a certain brand of equipment for which Company A was a distributor, resulting in additional business from PDVSA for Company A;

        b.  providing Pinto with inside information regarding PDVSA; and

6

    c. assisting Company A in receiving payment for previously awarded PDVSA business, including by requesting payment priority for Company A over other vendors.

19.    Beginning in or around 2009 and continuing through at least 2013, the conspirators agreed that three percent of every payment made by PDVSA to Company A would be split as bribe payments and kickbacks as follows:

    a. initially, as an even four-way split between bribes to Camacho, Guedez, and Official A, and kickbacks to Pinto;

    b. after Official A's employment at PDVSA was terminated in approximately 2009 or 2010, as an even three-way split between Camacho, Guedez, and Pinto; and

    c. from in or around March 2012, **MULLER** received 0.5% while Camacho, Guedez, and Pinto evenly split the remaining 2.5%.

20.    **MULLER**, together with others, caused bribe payments to be wired from Company A's Affiliate's bank account in Curacao to the Swiss Account.

21.    Guedez maintained a spreadsheet tracking the amounts paid into the Swiss Account from Company A's Affiliate, and the amounts disbursed from the Swiss Account to the foreign officials, **MULLER**, and Pinto.

22.     **MULLER** and Pinto, together with others, attempted to conceal, and did in fact conceal, the nature, source, and ownership of the bribes and kickbacks, by:

   a. providing Guedez and Camacho with information regarding PDVSA's payments to Company A, which Guedez used to create false invoices in the name of Shell Company A;

   b. causing invoices from Shell Company A to be paid, despite knowing that Shell Company A had not provided any services to Company A or Company A's Affiliate; and

   c. communicating about the scheme using their personal email accounts, rather than their official Company A email accounts.

23.     Over the course of the scheme, **MULLER** and Pinto caused Company A's Affiliate to wire in excess of $3 million to the Swiss Account.

## Overt Acts

24.     In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

25.    In or about 2009, Pinto, Camacho, Guedez, and Official A met at a restaurant on Westheimer Road in Houston, Texas, and discussed and agreed upon the bribery scheme.

26.    On or about February 16, 2011, Pinto sent an email to Camacho and Guedez listing purchase orders for which Company A had been paid and noting the three-percent calculation for this group of invoices as $167,601.99.

27.    On or about February 21, 2011, Guedez emailed **MULLER** a false invoice in the amount of $167,601.99 in the name of Shell Company A.  The invoice falsely stated, in Spanish, that Shell Company A had performed consulting services for Company A's Affiliate and directed Company A's Affiliate to send payment to the Swiss Account, notwithstanding that Shell Company A had not performed any services for Company A or Company A's Affiliate.

28.    On or about March 10, 2011, **MULLER** caused $167,601.99 to be wired to the Swiss Account.

29.    On or about April 2, 2012, Pinto sent an email to Camacho and Guedez listing purchase orders for which Company A had been paid and noting the three-percent calculation for this group of invoices as $159,542.98.

30.    On or about April 3, 2012, Guedez emailed **MULLER** a false invoice in the amount of $159,542.98 in the name of Shell Company A.  The invoice falsely stated, in Spanish, that Shell Company A had performed consulting services for

Company A's Affiliate and directed Company A's Affiliate to send payment to the Swiss Account, notwithstanding that Shell Company A had not performed any services for Company A or Company A's Affiliate.

31.     On or about April 10, 2012, **MULLER** caused $159,542.98 to be sent to the Swiss Account.

32.     On or about December 2, 2012, Pinto sent an email to Camacho and Guedez listing purchase orders for which Company A had been paid and noting the three-percent calculation for this group of invoices as $62,217.17.

33.     On or about December 26, 2012, Guedez emailed **MULLER** a false invoice in the amount of $62,217.17 in the name of Shell Company A.  The invoice falsely stated, in Spanish, that Shell Company A had performed consulting services for Company A's Affiliate and directed Company A's Affiliate to send payment to the Swiss Account, notwithstanding that Shell Company A had not performed any services for Company A or Company A's Affiliate.

34.     On or about January 16, 2013, **MULLER** caused $62,217.17 to be sent to the Swiss Account.

35.     On or about February 18, 2013, Pinto sent an email to Camacho and Guedez listing the payments made by PDVSA to Company A, the payments made by Company A's Affiliate to the Swiss Account, and the payments owed to each individual.

36.    On or about August 20, 2014, Pinto forwarded the email described in paragraph 35 to Camacho.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Conspiracy – 18 U.S.C. § 371)

37.     Paragraphs 1 through 13 and 16 through 36 are realleged and incorporated by reference as though fully set forth herein.

38.     Beginning in or around 2009 and continuing until at least 2013, in the Southern District of Texas and elsewhere, the defendant,

### FRANZ HERMAN MULLER HUBER

did willfully and knowingly conspire, confederate, and agree with Pinto and others known and unknown to the United States to commit offenses against the United States, that is, to devise a scheme and artifice to defraud Company A and Company A's Affiliate, and to obtain money and property from Company A and Company A's Affiliate by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds in violation of Title 18, United States Code, Section 1343.

### Manner and Means of the Conspiracy

39.     The manner and means by which **MULLER**, Pinto, and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

12

40.     **MULLER** and Pinto would and did receive a share of the money sent to the Swiss Account.

41.     Devising a system that concealed from Company A and Company A's Affiliate that **MULLER** and Pinto would receive a share of the "commissions" sent to the Swiss Account, specifically:

    a.  Pinto used a personal email account, and not his Company A email account, to provide Guedez with the information regarding PDVSA's payments to Company A, which Guedez used to create false invoices in the name of Shell Company A;

    b.  Guedez used an email account in the name of Shell Company A to send the false invoices to **MULLER**, through **MULLER**'s personal email account, and not his Company A email account;

    c.  **MULLER** caused Company A's Affiliate to pay the false invoices sent by Guedez for purported consulting services provided to Company A's Affiliate, despite the fact that Shell Company A did not actually provide any consulting, or other, services;

    d.  After payment for the false invoices was sent to the Swiss Account, Guedez dispersed the proceeds to the conspirators, including **MULLER** and Pinto, through offshore accounts, accounts in the

names of third parties, and accounts in the names of corporate entities.

e.  Pinto provided instructions to Guedez and Camacho regarding the bank accounts to which **MULLER**'s and Pinto's kickbacks were sent.

42.  Payments for **MULLER** were wired from the Swiss Account to the Puerto Rico Account, and then wired from the Puerto Rico Account to accounts at multiple banks in **MULLER**'s name.

## Overt Acts

43.  In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas and elsewhere, at least one of the following overt acts, among others:

44.  On or about February 15, 2012, Pinto sent Guedez and Camacho an email containing bank account information for the Puerto Rico Account.

45.  On or about March 1, 2012, $80,562.86 was wired from the Swiss Account to the Puerto Rico Account for **MULLER's** benefit.

46.  On or about May 14, 2012, $98,269.02 was wired from the Swiss Account to the Puerto Rico Account for **MULLER's** benefit.

47.     On or about December 17, 2012, $84,570.95 was wired from the Swiss

Account to the Puerto Rico Account for **MULLER's** benefit.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

48.     Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendant,

**FRANZ HERMAN MULLER HUBER,**

that upon conviction of either of the offenses charged in Counts 1 and 2 of this Information, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

16

## PROPERTY IN SUBSTITUTION

49.   In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States may seek to forfeit any other property of the defendant in substitution up to the total value of the property subject to forfeiture. The United States may seek the imposition of a money judgment against the defendant.


RYAN K. PATRICK
UNITED STATES ATTORNEY

ROBERT ZINK
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE


BY: _____
JOHN P. PEARSON
ROBERT S. JOHNSON
ASSISTANT UNITED STATES
ATTORNEYS

BY: _____
SARAH E. EDWARDS
SONALI D. PATEL
TRIAL ATTORNEYS